UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ICM CONTROLS CORP.,                                    Case No.: 5:23-cv-01328
                                                                              (DNH/TWD)
                              Plaintiff,

                    v.                                              **ANSWER**

AQUACAL AUTOPILOT, INC.,

                              Defendant.
_____

      Defendant AQUACAL AUTOPILOT, INC. ("**Defendant**"), by and through its attorneys, Harris Beach PLLC, as and for an Answer to the Complaint (the "**Complaint**") of Plaintiff, ICM Controls Corp. ("**Plaintiff**"), dated August 28, 2023, responds as follows:[1]

      1.     Admit to the extent that Plaintiff is a Delaware corporation with a principal place of business at 7313 William Barry Boulevard, Syracuse, New York 13212. Deny knowledge or information sufficient to form a belief as to the remaining allegations in this paragraph.

      2.     Admit to the extent that Defendant is a Florida corporation with a principal place of business at 2737 24th Street North, St. Petersburg, Florida.  Deny to the extent that products Defendant manufactures are used "in" swimming pools.

      3.     Admit that Plaintiff brought this action against Defendant.  Deny the remaining allegations in this paragraph.

      4.     Deny the allegations in this paragraph.

      5.     Deny the allegations in this paragraph.

      6.     Deny the allegations in this paragraph.

---

[1] The numerical responses in this Answer correspond with numerical allegations in the Complaint.

7.      Deny the allegations in this paragraph.

8.      Deny the allegations in this paragraph.

9.      Admit the allegations in this paragraph to the extent Plaintiff seeks damages for breach of contract. Deny that Defendant failed to remit payment, failed to accept the products alleged, that such products were specifically produced for Defendant, or that Defendant breached any contract.

## JURISDICTION

10.     Deny to the extent that this allegation is no longer relevant as this matter has been removed to United States District Court for the Northern District of New York from New York State Supreme Court, Onondaga County.

## RELEVANT BACKGROUND

11.     Deny the allegations in this paragraph.

12.     Deny the allegations in this paragraph.

13.     Deny the allegations in this paragraph.

14.     Deny the allegations in this paragraph.

15.     Deny the allegations in this paragraph.

16.     Deny the allegations in this paragraph.

17.     Deny knowledge or information sufficient to form a belief as to the allegations in this paragraph.

18.     Deny the allegations in this paragraph.

19.     Deny the allegations in this paragraph.

20.     Admit that Defendant received an email from Plaintiff regarding the design of products.  Deny that Defendant infringed on any alleged patents.

21.     Deny the allegations in this paragraph.

22.     Deny the allegations in this paragraph.

23.     Deny the allegations in this paragraph.

24.     Deny the allegations in this paragraph.

25.     Admit that members of Defendant's engineering staff visited Plaintiff's facilities in November 2019 and members of Plaintiff's staff visited Defendant's facilities in December 2019. Deny that any site visits were part of any alleged negotiations.

26.     Deny the allegations in this paragraph.

27.     Deny the allegations in this paragraph.

28.     Deny the allegations in this paragraph.

29.     Deny the allegations in this paragraph.

30.     Deny the allegations in this paragraph.

31.     Deny the allegations in this paragraph.

32.     Deny the allegations in this paragraph.

33.     Deny the allegations in this paragraph.

34.     Deny the allegations in this paragraph.

35.     Deny the allegations in this paragraph.

## THE PURCHASE ORDERS

36.     Deny the allegations in this paragraph.

37.     Deny the allegations in this paragraph.

38.     Deny knowledge or information sufficient to form a belief as to whether the documents attached to the Complaint as **Exhibit A** and **Exhibit B** constitute true and accurate copies of Plaintiff's Terms and Conditions of Sale, or Cancellation Policy, in existence during the

time of any purchase orders submitted by Defendant.  Deny all remaining allegations in this paragraph.

39.     Deny the allegations in this paragraph.

40.     Deny knowledge or information sufficient to form a belief as to whether the document attached to the complaint as **Exhibit B** constitutes a true and accurate copy of Plaintiff's Cancellation Policy at the time of any purchase order alleged in the Complaint.  Admit to the extent that such attached document reads as alleged.

41.     Deny knowledge or information sufficient to form a belief as to whether the document attached to the complaint as **Exhibit A** constitutes a true and accurate copy of Plaintiff's Terms and Conditions of Sale in existence at the time of any purchase order alleged in the Complaint.  Admit to the extent that such document attached to the Complaint reads as alleged.

42.     Deny the allegations in this paragraph.

43.     Deny the allegations in this paragraph.

44.     Deny the allegations in this paragraph.

45.     Deny the allegations in this paragraph.

46.     Deny the allegations in this paragraph.

47.     Deny the allegations in this paragraph.

48.     Deny the allegations in this paragraph.

49.     Admit the allegations in this paragraph.

50.     Deny the allegations in this paragraph.

51.     Deny the allegations in this paragraph.

52.     Admit the allegations in this paragraph.

53.     Admit the allegations in this paragraph.

54.    Deny the allegations in this paragraph.

55.    Deny the allegations in this paragraph.

56.    Deny the allegations in this paragraph.

57.    Deny the allegations in this paragraph.

58.    Deny the allegations in this paragraph.

59.    Deny the allegations in this paragraph.

60.    Deny the allegations in this paragraph.

61.    Deny the allegations in this paragraph.

62.    Deny the allegations in this paragraph.

63.    Deny the allegations in this paragraph.

64.    Admit the allegations in this paragraph.

65.    Deny the allegations in this paragraph.

66.    Deny the allegations in this paragraph.

67.    Deny the allegations in this paragraph.

68.    Admit the allegations in this paragraph.

69.    Deny the allegations in this paragraph.

70.    Deny the allegations in this paragraph.

71.    Deny the allegations in this paragraph.

72.    Deny the allegations in this paragraph.

73.    Deny the allegations in this paragraph.

74.    Deny the allegations in this paragraph.

75.    Deny the allegations in this paragraph.

76.    Deny the allegations in this paragraph.

77.     Deny the allegations in this paragraph.

78.     Deny the allegations in this paragraph.

79.     Deny the allegations in this paragraph.

80.     Admit the allegations in this paragraph.

81.     Deny the allegations in this paragraph.

82.     Deny the allegations in this paragraph.

83.     Deny the allegations in this paragraph.

84.     Deny the allegations in this paragraph.

85.     Admit to the extent that Plaintiff, through counsel, sent a letter dated May 4, 2023, to Defendant demanding payment.  Deny all remaining allegations in this paragraph.

86.     Deny the allegations in this paragraph.

87.     Deny the allegations in this paragraph.

88.     Deny the allegations in this paragraph.

89.     Deny the allegations in this paragraph.

90.     With regard to the allegations contained in this paragraph, wherein prior allegations in the Complaint are incorporated therein, Defendant repeats its prior responses to said allegations and incorporates the responses herein.

91.     Deny the allegations in this paragraph.

92.     Deny the allegations in this paragraph.

93.     Admit to the extent that the document attached to the Complaint as **Exhibit B** reads as alleged. Deny all remaining allegations in this paragraph.

94.     Deny the allegations in this paragraph.

95.     Deny the allegations in this paragraph.

96.     Deny the allegations in this paragraph.

97.     Deny the allegations in this paragraph.

98.     Deny the allegations in this paragraph.

99.     Deny the allegations in this paragraph.

100.    Deny each and every request for relief in Plaintiff's "Wherefore" clause.

101.    Deny any other allegation in the Complaint to which a response has not otherwise been provided herein.

### FACTUAL BASIS FOR AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

102.    Defendant manufactures heating and cooling pumps for swimming pools.

103.    In producing the control units for these pumps, Defendant engages contract manufacturers of various components, including electronic control circuit boards and displays for use in Defendant's production of final pump units.

104.    When engaging contract manufacturers to produce electronic components, Defendant designs all circuitry to its own specifications and provides the final design to the contract manufacturer to create the control circuitry and the associated display.

105.    Defendant engaged Plaintiff, in or about 2016, to manufacture the HP7 control unit, which is a three-character display, and the associated control circuitry.

106.    In engaging Plaintiff, Defendant specifically sought to implement a design change featuring a touch-screen display.  Previous versions of the HP7 control unit featured tactile buttons.

107.    In or about 2018, Defendant engaged Plaintiff to produce the HP9 control unit, which consists of a two-line, 24-character display, capacitive touch buttons, and an electronic control circuit board.

108.    The HP9 control unit is a newer generation product with more features than the HP7.

109.    In order to ensure a continuous supply of control units to produce pumps, Defendant places orders with its contract suppliers approximately six months in advance.

110.    Defendant submitted a purchase order for components to Plaintiff with an expected delivery date of November 1, 2021.

111.    On or about November 16, 2021, two weeks after the expected delivery date of that purchase order, Plaintiff notified Defendant that it was unable to source Allegro A4447SLJTR-T buck regulators ("**Allegro Buck Regulators**"), a direct current regulating component essential to the production of the control circuit of the HP9 control unit. Each control board uses three Allegro Buck Regulators.

112.    Plaintiff stated that "[e]ngineering and procurement have researched second sourcing and found nothing pin for pin compatible."

113.    That same week, Defendant sought and procured from a third-party 1,946 Allegro Buck Regulators and delivered them to Plaintiff at Defendant's cost.

114.    Plaintiff accepted all Allegro Buck Regulators procured by Defendant.

115.    In response to the supply issue regarding Allegro Buck Regulators, Defendant designed a circuit board it identified as revision H ("**Revision H**"), which utilized two Allegro Buck Regulators instead of three.

116.    On or about December 9, 2021, Defendant submitted the proposed redesign to Plaintiff.

117.    From December 9, 2021, to January 20, 2022, Defendant reminded Plaintiff to review its Revision H redesign proposal during weekly meetings.

118.    On or about January 5, 2022, Plaintiff notified Defendant through its third-party sales representative that there were no issues regarding the supply of any components necessary to the production of control units.

119.    From on or about December 9, 2021, to January 20, 2022, Defendant reminded Plaintiff during the parties' weekly meetings to review Defendant's Revision H redesign proposal. On or about January 20, 2021, Defendant sent a second email to Plaintiff to review Defendant's Revision H redesign proposal.

120.    On or about February 4, 2022, Plaintiff informed Defendant by email of supply chain risks to seven components including the Allegro Buck Regulators, which the email listed as having a "high" supply risk.

121.    At the time of this email, on or about February 4, 2021, Defendant had purchased more than 21,000 Allegro Buck Regulators and shipped them to Plaintiff.

122.    Plaintiff accepted all Allegro Buck Regulators that Defendant supplied.

123.    Plaintiff did not pay or reimburse Defendant, or otherwise compensate or credit Defendant in any manner, for Defendant's purchase of the Allegro Buck Regulators that were paid by Defendant and delivered to Plaintiff.

124.    On February 8, 2022, Defendant sent a list of approved replacement components to Plaintiff and asked Plaintiff for weekly updates as to the availability of components.

125.    On or about March 4, 2022, Plaintiff informed Defendant by email that their production line had stopped and there was "no recovery."

126.    In this email, Plaintiff stated that it had located the approved replacement, Surge VZH471M1KTR-1816KS capacitors, for the Panasonic EEV-FK1J471M capacitors.  However, by the time Plaintiff attempted to purchase this component, the supply "was lost[.]"

127.    On or about March 5, 2022, Defendant located a supply of approximately 5,600 suitable replacement capacitors, and informed Plaintiff of same.

128.    On or about March 16, 2022, Defendant's procurement specialist informed Plaintiff's staff that he had located approximately 10,000 components needed to restart production of the control units.

129.    Plaintiff did not respond.

130.    On or about March 24, 2022, leadership staff from Defendant traveled to Plaintiff's facilities and gave a presentation regarding sourcing and communication issues.

131.    As part of this renewing of relations, engineers from Plaintiff and Defendant developed a solution to eliminate the need for the one buck regulator per control board.  In or about March 2022, Defendant asked for a memorandum of understanding ("**MOU**") as to this project and the parties' continued business.

132.    On or about May 3, 2022, Defendant received from Plaintiff a proposed non-disclosure agreement as to the solution discussed in March 2022.

133.    On or about July 6, 2022, Defendant notified Plaintiff that because of the ongoing communication and sourcing issues with Plaintiff, Defendant engaged another manufacturer to create a new control unit and display module identified as the HP11 control unit.

134.    In or about August 2022, Plaintiff sent a proposed MOU to Defendant.  Defendant found the terms of this MOU to be unacceptable.

**Delays in Plaintiff's Fulfillment Leads to Production Shutdowns**

135.    On or about June 21, 2021, Defendant placed purchase order 6116 ("**PO 6116**") for 21,000 BG4202-MCS display assembly units for HP9 control units due in equal amounts of 3,500

units on September 7, 2021; October 6, 2021; November 5, 2021; December 6, 2021; January 5, 2022; and February 7, 2022.

136.    In relation to PO 6116, Plaintiff delivered equal amounts of 3,500 display units on September 16, 2021; October 29, 2021; January 24, 2022; February 11, 2022; May 23, 2022; and June 10, 2022.

137.    On or about June 21, 2021, Defendant placed purchase order 6117 ("**PO 6117**") for 17,000 BG4200-MCS control boards for HP9 control units with 3,000 boards due on October 6, 2021; and equal amounts of 3,500 boards due on November 5, 2021; December 6, 2021; January 5, 2021; and February 7, 2021.

138.    In relation to PO 6117, Plaintiff delivered 3,000 units on February 3, 2022; and equal amounts of 3,500 units on March 22, 2022; April 8, 2022, May 24, 2022, and December 21, 2022.

139.    On or about November 23, 2021, Defendant placed purchase order 6804 ("**PO 6804**") with Plaintiff for 24,000 BG4200-MCS control boards for HP9 units due in equal amounts of 4,000 boards on March 14, 2022; April 11, 2022; May 9, 2022; June 13, 2022; July 18, 2022; and August 8, 2022.

140.    In relation to PO 6804, Plaintiff delivered 8,000 BG4200-MCS control boards on or about January 11, 2023, and 641 control boards on or about January 26, 2023.  Aside from these 8,641 control boards, Plaintiff has not delivered any other control boards in relation to PO 6804. PO 6804 remains unfulfilled.

141.    On or about November 29, 2021, Defendant placed purchase order 7172 ("**PO 7172**") for 24,000 BG4202-MCS display assembly units for HP9 units due in equal amounts of

4,000 units on March 14, 2022; April 11, 2022; May 16, 2022; June 13, 2022; July 11, 2022; and August 15, 2022.

142.    In relation to PO 7172, Plaintiff delivered 2,100 units on July 5, 2022; 2,795 units on August 16, 2022; and 5,303 units in late January and early February 2023.

143.    On or about February 23, 2022, Defendant placed purchase order 7890 ("**PO 7890**") for 8,000 BG4200-MCS control boards for HP9 units due in equal amounts of 4,000 boards on September 5, 2022, and October 3, 2022.

144.    Plaintiff has not delivered any control boards in relation to PO 7890.

145.    In addition to the delays in shipping and sourcing Defendant experienced, Plaintiff also shipped display units to Defendant without accompanying control boards.

146.    Defendant cannot install a display unit without the accompanying control board to produce a completed heat pump product.

147.    As a result of Plaintiff's delays in delivering components Defendant ordered within a reasonable time of the promised due dates, Defendant was forced to shut down its heat pump production.

148.    Defendant shut down production for four days in December 2021, one day in April 2022, two days in May 2022, four days in June 2022, five days in July 2022, three days in August 2022, six days in September 2022, four days in October 2022, two days in November 2022, and one day in December 2022.

149.    During that time, approximately 100 to 150 employees were unable to work but Defendant, nonetheless, paid them at a total cost of approximately $876,416.00.

150.    Due to Defendant's inability to produce heat pumps during the production shutdowns, Defendant was unable to meet demand for its products, including products that used

the HP9.  Defendant suffered damages, including lost profits, as a result of Plaintiff's delays and lack of notification.

### Cancellation of Outstanding Purchase Orders

151.    On or about February 10, 2023, due to Plaintiff's failure to satisfy its delivery requirements under the various purchase orders, Defendant sent an email as notice of cancellation to Plaintiff of all open purchase orders "due to the persistent delays and cost increases."

152.    This email further informed Plaintiff that Defendant had informed its receiving personnel to refuse any shipment from Plaintiff.

### Components Provided To Plaintiff for Which Defendant Was Not Compensated

153.    Between on or about December 21, 2021, and on or about April 29, 2022, Defendant procured the following components ("**Components**") at its own cost and supplied them to Plaintiff:

a.    Approximately 51,615 Allegro Buck Regulators at a total cost of $3,170,591.01.

b.    Approximately 32,472 63V SMD aluminum capacitors at a total cost of $186,934.72.

c.    Approximately 20,400 SN65HVD232DR transceivers at a total cost of $52,100.00.

d.    Approximately 315 LM317BD2TR4G and LM317BD2TG linear voltage regulators at a total cost of $273.42.

e.    Approximately 12,100 PIC18F25K80-I/SS microcontrollers at a total cost of $90,155.00.

f.    Approximately 25,000, 100 uF 1206 X5R 20% 6.3 VDC multilayer ceramic capacitors at a total cost of $14,750.00

g.    Approximately 18,900, 220 uF 16 VDC aluminum electrolytic capacitors at a total cost of $2,421.28.

h.    Approximately 4,000, 3.3 V SOT-223-3 LDO voltage regulators at a total cost of $3,680.00.

i.    Approximately 7,000, 31:1 P-Channel 2.5A SuperSOT-6 power switches at a total cost of $56,000.00.

154.    Defendant shipped the Components to Plaintiff at Defendant's own cost.

155.    Plaintiff accepted the shipments of all Components listed in paragraph 153.

156.    Plaintiff did not pay or reimburse Defendant, or otherwise compensate or credit Defendant in any manner, for Defendant's purchase of the Components that were paid by Defendant and delivered to Plaintiff.

157.    The total cost to Defendant of these components is $3,576,905.43.

158.    All balances for the Components remain due and owing from Plaintiff to Defendant.

## AFFIRMATIVE DEFENSES

159.    In support of each and every affirmative defense below, Defendant repeats and realleges each and every allegation contained in paragraphs 102 through 158, inclusive, with the same force and effect as if hereinafter set forth in full under each affirmative defense.

### First Affirmative Defense

160.    Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitation.

## Second Affirmative Defense

161.    To the extent Plaintiff and Defendant entered into any agreement, Defendant's performance was excused under the doctrine of force majeure.

## Third Affirmative Defense

162.    To the extent Plaintiff and Defendant entered into any agreement, Defendant's performance was excused under the doctrine of frustration of purpose.

163.    Plaintiff's repeat and continued delay in fulfilling the purchase orders submitted by Defendant frustrated the purpose of any purchase orders alleged.

## Fourth Affirmative Defense

164.    To the extent Plaintiff and Defendant entered into any agreement, Defendant's performance was excused under the doctrine of commercial impracticability of performance.

165.    Plaintiff's continued and ongoing delay in fulfilling purchase orders and lack of seasonable notice regarding any nonperformance rendered Defendant's performance under any alleged contract impracticable.

166.    Timely performance under any contract formed by any purchase order was a basic assumption on which Defendant entered into any contract to purchase from Defendant.

## Fifth Affirmative Defense

167.    To the extent Plaintiff and Defendant entered into any agreement, Defendant's performance was excused as a result of commercial impossibility of performance.

168.    Plaintiff's continued and ongoing delay in fulfilling purchase orders and lack of seasonable notice regarding any nonperformance caused Defendant to develop a new product line with a new supplier to circumvent Plaintiff's supply, production, and communication issues.

169.    Implementation of the new product rendered Defendant's performance with regard to the HP9 product impossible.

## Sixth Affirmative Defense

170.    Plaintiff's claims are barred, in whole or in part, because Plaintiff seeks unenforceable liquidated damages.

## Seventh Affirmative Defense

171.    Plaintiff's claims are barred, in whole or in part, by one or more of the doctrines of ratification, consent, acquiescence, waiver, estoppel, statute of frauds, or laches.

## Eighth Affirmative Defense

172.    Plaintiff has failed to mitigate its alleged damages.

173.    After multiple instances of Plaintiff's materially untimely delivery of products and insufficient communication regarding such delays, Defendant cancelled all outstanding purchases orders.

174.    Plaintiff did not mitigate its damages after it received notice of Defendant's cancellation.

## Ninth Affirmative Defense

175.    Plaintiff's Terms and Conditions and Cancellation Policy are not, in whole or in part, enforceable or applicable.

## Tenth Affirmative Defense

176.    To the extent Plaintiff and Defendant entered into any agreement, the alleged agreement was modified by trade usage, course of dealing, or course of performance.

## Eleventh Affirmative Defense

177.    Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

### Twelfth Affirmative Defense

178.    Plaintiff's alleged damages are subject to setoff or recoupment by Defendant.

179.    Defendant supplied 171,802 electronic components to Plaintiff, which Plaintiff accepted.

180.    These components cost Defendant $3,576,905.43.

181.    Plaintiff did not remit payment for these components or compensate Defendant in any way.

## COUNTERCLAIMS

### FIRST COUNTERCLAIM
### (Breach of Contract under NY UCC 2-201)

182.    Defendant repeats and realleges each and every allegation contained in paragraphs 102 through 158, inclusive, with the same force and effect as if hereinafter set forth in full.

183.    Due to Plaintiff's inability to procure components, from December 21, 2021, to April 19, 2022, Defendant agreed to procure and ship to Plaintiff, and did so ship to Plaintiff approximately 171,802 Components.

184.    Plaintiff accepted shipments of Components procured by Defendant.

185.    The material Defendant sourced for the Components cost Defendant approximately $3,576,905.43.

186.    Plaintiff's acceptance of the material constitutes a contract for the supply of the Components under the New York Uniform Commercial Code.

187.    Defendant complied with its obligations under the contract.

188.    Plaintiff has not remitted any payment for the Components nor has Plaintiff compensated Defendant in any other way for the Components or the shipping costs.

189.    All balances for the Components remain due and owing from Plaintiff to Defendant.

190.    As a result of the above, Defendant has suffered damages for an amount to be determined at trial but, in any event, no less than the principal amount of $3,576,905.43.

## SECOND COUNTERCLAIM
### (Breach of Contract)

191.    Defendant repeats, reiterates, and realleges each and every allegation contained in paragraphs 102 through 158, inclusive, with the same force and effect as if hereinafter set forth in full.

192.    By and through purchase orders PO 6116, PO 6117, PO 6804, PO 7172, and PO 7890, Defendant contracted with Plaintiff to supply display and control units for heat pumps.

193.    Defendant complied with its obligations under purchase orders PO 6116, PO 6117, PO 6804, PO 7172, and PO 7890.

194.    Plaintiff did not timely or seasonably notify Defendant of delay in production, shipping, and delivery of items.

195.    Plaintiff shipped items such as displays without the associated control units rendering the displays unsuitable for production.

196.    Due to the delay in delivery and partial delivery of these materials, Defendant was forced to stop production.

197.    Defendant stopped production for 32 days from December 2021 to December 2022

198.    As a result of the above, Defendant has sustained damages for losses to be determined at trial for wages paid to employees notwithstanding the forced stoppage in production, and for lost profits resulting from production stoppages that occurred as a result of Plaintiff's significant delays and failure to deliver products ordered.

## THIRD COUNTERCLAIM
### (Unjust Enrichment)

199.    Defendant repeats, reiterates, and realleges each and every allegation contained in paragraphs 102 through 158, inclusive, with the same force and effect as if hereinafter set forth in full.

200.    Defendant pleads this cause of action in the alternative to its First Cause of Action for breach of contract for the sale of the Components.

201.    From December 21, 2021, to April 19, 2022, Defendants procured and shipped approximately 171,802 Components to Plaintiff.

202.    Plaintiff accepted shipments of Components procured by Defendant.

203.    The material Defendant sourced cost Defendant approximately $3,576,905.43.

204.    Plaintiff has not remitted any payment for the components nor has Plaintiff compensated Defendant in any other way for the Components or the shipping costs.

205.    All balances for the Components remain due and owing from Plaintiff to Defendant.

206.    It is against equity and good conscience to permit Plaintiff to accept the Components that it would otherwise have sourced on its own, and at its own cost, without compensating Defendant for such Components.

207.    As a result of the above, Defendant has suffered damages for an amount to be determined at trial but, in any event, no less than the principal amount of $3,576,905.43.

## FOURTH COUNTERCLAIM
### (Setoff)

208.    Defendant repeats, reiterates, and realleges each and every allegation contained in paragraphs 102 through 158, inclusive, with the same force and effect as if hereinafter set forth in full.

209.    Plaintiff accepted and utilized Components supplied by Defendant.

210.    All balances for the Components remain due and owing from Plaintiff to Defendant.

211.    Any amounts allegedly owed to Plaintiff are subject to setoff for any amounts that may be owed to Defendant.

## FIFTH COUNTERCLAIM
### (Recoupment)

212.    Defendant repeats, reiterates, and realleges each and every allegation contained in paragraphs 102 through 158, inclusive, with the same force and effect as if hereinafter set forth in full.

213.    Plaintiff accepted and utilized Components supplied by Defendant.

214.    All balances for the Components remain due and owing from Plaintiff to Defendant.

215.    Any amounts allegedly owed to Plaintiff are subject to recoupment for amounts owed to Defendant.

Defendant reserves the right to assert additional affirmative defenses, other defenses, and counterclaims that may become applicable to any claims herein about which it becomes aware during the course of the investigation and/or trial and, therefore, reserves the right to amend this Answer and affirmative defenses as appropriate.

## DEMAND FOR JURY TRIAL

Defendant demands a trial by jury as to all issues so triable.

**WHEREFORE**, Defendant, AQUACAL AUTOPILOT, INC., respectfully requests judgment dismissing the Complaint in its entirety, with prejudice, a judgment in its favor against Plaintiff, ICM CONTROLS CORP., in an amount to be determined at trial but in no event less than the principal amount of $3,576,905.43, together with pre-judgment interest, costs and disbursements, along with such other, further and additional relief this Court deems just and proper.

Dated: December 29, 2023

**HARRIS BEACH PLLC**

By: */s/ Julian B. Modesti*
     Julian B. Modesti
     (Bar Roll No. 507674)
     Meaghan L. Feenan
     (Bar Roll No. 700028)

333 West Washington Street, Suite 200
Syracuse, New York 13202
(315) 214-2004
*jmodesti@harrisbeach.com*
*mfeenan@harrisbeach.com*

*Attorneys for the Defendant*